Source: Legal > Area of Law - By Topic > Labor & Employment > Administrative Materials & Regulations > Federal > Agency Decisions > **Equal Employment Opportunity Commission Public Sector Decisions** ⓘ
Terms: 01a12209 (Edit Search)

*2002 EEOPUB LEXIS 6774, ** 

Beverly L. Wright, Complainant, v. John E. Potter, Postmaster General, United States Postal Service, (Capital-Metro Area), Agency

Appeal No. **01A12209** Agency No. 4K-210-0133-99

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

2002 EEOPUB LEXIS 6774

September 25, 2002

**CORE TERMS:** mail, disability, duty, clerk, reasonable accommodation, trays, scooter, co-worker, Rehabilitation Act, light duty, vacancy, fitness, disability-related, accommodation, reassignment, mobility, postal, push, capable of performing, discriminatory, reduction, pretext, pushing, lifting, parcels, pounds, final decision, time period, night, Disabilities Act

**ISSUEDBY:** [*1] For the Commission by Carlton M. Hadden, Director, Office of Federal Operations

**OPINION:**
DECISION

Complainant timely initiated an appeal from a final agency decision (FAD) concerning her complaint of unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq.* and Section 501 of the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. § 791 *et seq.* The appeal is accepted pursuant to 29 C.F.R. § 1614.405. For the following reasons, the Commission AFFIRMS the agency's final decision.

The record reveals that during the relevant time, complainant was employed as a Distribution Clerk at the agency's Lutherville-Timonium, Maryland Post Office facility. Complainant sought EEO counseling and subsequently filed a formal complaint on June 29, 1999, alleging that she was discriminated against on the bases of race (African-American), sex (female), and disability (Multiple Sclerosis) when: (1) on February 23, 1999 to July 1999, she was only allowed to work two hours per night and forced to use leave to cover the remainder [*2] of her tour; (2) on unspecified dates, her supervisor (S1) stayed at her work station and counted every piece of mail processed by her; (3) on April 14, 1999, she was threatened arrest by S1 in the presence of another employee and told not to come to work until this matter was resolved; (4) during March 1999 and July 1999, she was forced to submit to fitness for duty examinations; (5) on May 12, 1999 and May 24, 1999, she was forced to go home by another supervisor (S2); and (6) on June 11, 1999, she presented documents to S1 for the approval of Family Medical Leave (FMLA) and on June 16, 1999, she received a phone call from the Postmaster (P1) ordering her to submit to a fitness for duty examination.

At the conclusion of the investigation, complainant was informed of her right to request a hearing before an EEOC Administrative Judge or alternatively, to receive a final decision by the agency. When complainant failed to respond within the time period specified in 29 C.F.R. § 1614.108(f), the agency issued a final decision.

In its FAD, the agency concluded that the record establishes that complainant developed

Multiple Sclerosis (MS) some time after she was hired as a Distribution **[*3]** Clerk. n1 In August 1998, complainant was restricted by her physician to sedentary work, no use of machinery and required the use of a chair with back support. The agency accommodated these restrictions. In addition, the agency permitted complainant to use an electric scooter for ambulation in the building while working. Complainant was assigned light duty work involved returning undeliverable (nixie) mail.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n1 The agency found that complainant is a disabled individual under the Rehabilitation Act.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

According to the agency, complainant was capable of performing the essential functions of the light duty assignment until June 16, 1999. On June 11, 1999, complainant presented documentation to S1 pursuant to a request for FMLA leave for the period June 11, 1999 through January 6, 2000. On June 16, 1999, P1 ordered complainant to submit to a fitness for duty examination. S1 testified that his observations of seeing complainant trying to maneuver around the agency, holding on to anything available to keep from falling, **[*4]** prompted him to get a medical evaluation.

S1 approved complainant's FMLA request. However, on June 16, 1999, complainant was found not fit for duty by the agency physician (P2). Complainant was placed on sick leave at that time pending a review by the agency's reasonable accommodation committee (RAC).

The RAC concluded the following:

> 1. [Complainant] has an established medical condition, current medical restrictions which are permanent in nature. She also has an impairment which significantly limits , , , Walking - has documented evidence of balance problems that requires assistance in mobility and , , , is unable to carry, lift, push, pull, walk without assistance, and perform fine manipulation; performing manual tasks - spasticity causes reduction of fine manipulation, balance problems prevent carrying, lifting. She cannot be accommodated by eliminating non-essential functions of the position (current or potential new position).
>
> 2. [Complainant] has suggested the following means of accommodation for her to perform the duties of the distribution clerk: Use of scooter to carry trays of mail and for general mobility, use postal equipment for stability as pushing them to destination, **[*5]** push parcels on floor with her scooter, use co-worker assistance to get scooter in/out of car, use co-worker assistance in lifting trays of mail.
>
> 3. There are no accommodations available to enable [complainant] to perform the essential functions of the distribution clerk position. She has made suggestions, however, they are not acceptable as noted below:
>
>> Using scooter to carry trays of mail and for general mobility (if adaptable to carrying trays) could be used to transport mail from area to another, but [complainant] cannot remove the mail from an all purpose container (APC) or bulk mail container (BMC), using postal equipment for stability is a major safety issue; the weight is too much for her to control, visibility is reduced and should she lose

> control, it would cause her to fall and/or injure another employee, pushing parcels on floor is increasing the potential of damage of our customers' mail, co-worker can assist her with her scooter, having co-worker to assist with lifting is having another employee do her job.
>
> [Complainant's] physician has stated that "when seated she is capable of performing manual activities such as letter sorting relatively well." Independent neurology [*6] exam showed "significantly compromised" speed and dexterity in the right upper extremity which does not allow her to "even come close to the goals of 1150 flats or 2270 letters per hour" in distributing mail to carrier routes. [Complainant] is observed to have instability to gait, moderate-to-severe apastic paraparesis and opthalmoplegia. These debilitating conditions do not allow her to push the APC or BMC equipment, breakdown or lift trays of mail and place in another area, or stand/move around boxes. She has been observed to fall; she walks with assistance of cane or pushing cart and at the same time uses the wall as a guide for mobility.
>
> [Complainant] also has an eye condition that makes it difficult to read and to write, this condition enhances her difficulty in sorting mail.
>
> The essential functions of her position require mobility and ability to move equipment. Her compromised balance and motor dexterity do not allow her to safely push rolling equipment or perform any of the essential functions of the distribution clerk position.
>
> Any accommodation by co-workers assisting her would entail that co-worker to perform the essential functions of the position.

Based upon these [*7] circumstances, the agency concluded that complainant was not a qualified individual with a disability.

In addition, with respect to Issue 1, the agency concluded that the record evidence established that complainant was accommodated with light duty work starting in August 1998 with no reduction in her work hours. However, in January 1999, complainant's work hours were reduced to two hours per day. According to P1, in January 1999, there was a change in mail processing with the removal of automated equipment from Lutherville. Consequently, P1 cut back the light duty hours and reassigned four regular clerks from the facility to meet this objective. Accordingly, the agency concluded that the evidence established that complainant's work hours were reduced to two hours per night as a result of workforce/workload reductions. The agency further noted that complainant failed to identify any comparative employees outside her protected classes who were treated more favorably or present any evidence of pretext.

With respect to Issue 2, the agency concluded that complainant failed to present any evidence that established a causal nexus between her disability and S1's conduct of counting her [*8] mail. Moreover, S1 testified that he was directly responsible for the budget and the clerks' productivity related to letters, flats, and parcels. S1 further testified that he never stayed in complainant's work area any longer or shorter than he has done for other employees. The agency concluded that complainant failed to establish discriminatory motives behind S1's conduct.

With respect to Issue 3, the agency concluded that complainant failed to cite any

comparative employees outside of her protected groups who were treated more favorably under similar circumstances. The agency noted that S1 testified that on April 13, 1999, he called complainant at home and informed her that management would not be able to provide her with any light duty work and that she was not to report for work on April 14, 1999. S1 further testified that contrary to his instructions, complainant reported to work on April 14, 1999 and did not provide an explanation when he inquired about why she was ignoring his prior instruction. S1 also testified that he notified complainant that she was to leave the building and if she did not he would call the postal police to have her escorted off postal premises. S1 stated **[*9]** that he did not threaten complainant with an arrest. Moreover, complainant was scheduled to work the following night. The agency concluded that complainant failed to establish pretext or show that S1's conduct was motivated by discriminatory animus.

With respect to Issue 4, the agency asserts that complainant was only required to undergo one Fitness for Duty Examination (FFDE) which occurred in August 1998. After that FFDE, complainant was offered light duty work which she accepted. Complainant took sick leave for approximately 23 days from February 15, 1999 through March 10, 1999 due to her MS. Upon her return to work, complainant submitted a letter from her physician clearing her for duty.

With respect to Issue 5, S2 testified that on May 12, 1999 and May 24, 1999, she instructed complainant to go home after working two hours pursuant to S1's instructions. This reduction in hours related to workforce/workload reductions that were necessitated at the facility during this time as explained above. The agency concluded that complainant presented no evidence to prove pretext or that management's actions were based upon discriminatory motives.

With respect to Issue 6, the agency concluded **[*10]** that the evidence established that on June 11, 1999, complainant presented documentation to S1 pursuant to a request for FMLA leave for the period June 11, 1999 through January 6, 2000. On June 16, 1999, P1 ordered complainant to submit to a fitness for duty examination. S1 approved complainant's FMLA request. With respect to the request for a FFDE, S1 testified that his observations of seeing her trying to maneuver around the agency, holding on to anything available to keep from falling, prompted him to get a medical evaluation.

The agency asserts that a FFDE was never conducted but rather a duty status report was generated and dated June 16, 1999. According to P2, complainant was totally disabled as of June 16, 1999, and must clear through the medical unit to return to work. The duty status report advised complainant that she must have her physician complete forms and return them to the agency as soon as possible. Complainant did not challenge P2's duty status determination. The agency also notes that complainant completed an application for disability retirement dated July 7, 2000, and states that she "became disabled" for her position on June 11, 1999. The agency determined that **[*11]** complainant was not aggrieved and failed to state a claim with respect to this issue.

The agency generally concluded with respect to all claims, that complainant failed to cite similarly situated comparison employees outside her protected classes who were treated more favorably. Moreover, the agency concluded that the management officials articulated legitimate, non-discriminatory reasons for the employment actions and complainant failed to establish pretext or discriminatory motives. Accordingly, the agency concluded that complainant did not prove discrimination as alleged.

On appeal, complainant contends that she was capable of performing the essential functions of the position, with or without a reasonable accommodation and without endangering the health and safety of herself or others. Complainant asserts that she was capable of performing the essential functions of her position, until June 16, 1999. Moreover, complainant asserts that the accommodations that she suggested would have been effective.

In addition, complainant generally restates her position as set forth in her formal complainant and affidavit.

ANALYSIS AND FINDINGS

In essence, complainant's complaint consists [*12] of a disparate treatment claim; harassment claim; a claim of an impermissible medical examination; and a denial of a reasonable accommodation. Complainant alleged that the agency improperly sent her to a Fitness For Duty examination and failed to reasonably accommodate her disability. The remaining elements of her complaint comprise a claim of harassment on the bases of race, sex, and disability. Accordingly, the Commission will review each aspect of her complaint.

Medical Examination

The agency did not properly address complainant's claim regarding the agency's request for a Fitness-for-Duty examination. The Rehabilitation Act was amended in 1992 to apply the standards of the Americans with Disabilities Act (ADA) to complaints of discrimination by federal employees or applicants for employment. See EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (Enforcement Guidance - Disability Related Inquiries), No. 915.002 (July 26, 2000); Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (March 25, 1997); and EEOC Enforcement Guidance on Preemployment [*13] Disability-Related Questions and Medical Examinations (Enforcement Guidance - Preemployment) (October 10, 1995). Because the restrictions on employers with regard to disability-related inquiries and medical examinations apply to all employees, and not just to those with disabilities, it is not necessary to inquire whether the employee is a person with a disability. Enforcement Guidance - Disability Related Inquiries, p. 3. Instead, we focus on the issue of whether the agency ordered that complainant undergo a Fitness-for-Duty examination, and if so, was it lawful.

The Rehabilitation Act places certain limitations on an employer's ability to make disability-related inquiries or require medical examinations of employees only if it is job-related and consistent with business necessity. 29 C.F.R. §§ 1630.13(b), 14(c). Generally, a disability-related inquiry or medical examination of an employee may be "job-related and consistent with business necessity" when an employer "has a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due [*14] to a medical condition." Enforcement Guidance - Disability- Related Inquiries, at 15-16. It is the burden of the employer to show that its disability-related inquiries and requests for examination are job-related and consistent with business necessity. Id. at 15-23.

While there is no evidence in the record to support the assertion that the agency sent complainant for a FFDE in March and July, 1999, the record does support the finding that on May 10, 1999, P2 issued a "Duty Status Report" which stated that complainant "may use an electric scooter for ambulation in the building while working." There is no indication from the record that complainant was seen by P2 prior to her issuance of this report. Accordingly, we find insufficient evidence in the record to support the finding that complainant was required to undergo a FFDE in May 1999.

However, on June 16, 1999, P2 issued a second "Duty Status Report" which stated that complainant was not fit for duty as of June 16, 1999 until she is cleared by the medical unit to return to work. Complainant was advised in this report to have her physician complete forms and return them to the agency as soon as possible. While, there is [*15] no indication from the record that complainant actually underwent a FFDE on June 16, 1999, we will assume for the purposes of this decision that complainant was required to undergo a FFDE at that time since P2 concluded that complainant was unfit for duty.

The undisputed record indicates that in response to complainant's request for approximately six months of FMLA leave, in addition to S1's personal observations that complainant was having increasing difficulty maneuvering around the agency, a FFDE was requested. Moreover, while the record indicates that complainant's physician stated that when seated, complainant "was capable of performing manual activities such as letter sorting relatively well," other independent medical documentation indicated the contrary while providing details that complainant's physician did not.

Accordingly, the record indicates that the agency sent complainant for a FFDE because of its reasonable belief, following receipt of her FMLA request and personal observations of severe limitations, that complainant could not perform the essential functions of her position. Upon review of the record, we conclude that the agency met its burden of showing that the [*16] examination was job-related and consistent with business necessity. Accordingly, we find that the examination was not a violation of the Rehabilitation Act.

Reasonable Accommodation

As stated above, complainant alleges that the agency failed to provide her with a reasonable accommodation by failing to provide: (1) the use of a scooter to carry trays of mail and for general mobility; (2) the use of postal equipment (APC) for stability by pushing them to destination; (3) the permission to push parcels on floor with her scooter; (4) the use of co-worker assistance to get scooter in/out of car; and (5) the use of a co-worker assistance in lifting trays of mail.

Under the Commission's regulations, an agency is required to make reasonable accommodation to the known physical and mental limitations of an otherwise qualified individual with a disability unless the agency can show that accommodation would cause an undue hardship. 29 C.F.R. § 1630.9. The Commission also notes that an employee must show a nexus between the disabling condition and the requested accommodation. See *Wiggins v. United States Postal Service,* EEOC Appeal No. 01953715 (April 22, 1997).

As a threshold matter [*17] in a case of disability discrimination under a failure to accommodate theory, the complainant must demonstrate that she is an ""individual with a disability." We shall assume, *arguendo,* that complainant established that she is an individual with a disability covered by the Rehabilitation Act.

Complainant also must show that she is a "qualified" individual with a disability within the meaning of 29 C.F.R. § 1630.2(m). The agency argues that complainant is not a qualified individual with a disability because she could not perform the core duties of her clerk position. The record shows that the requirements of the distribution clerk position are as follows: (1) Breakdown n2 APC and BMC containers of mail and carry the mail to a distribution case (trays weigh 23 to 35 pounds and distance carried is about 5 feet); (2) Empty APC (weighs 209 to 235 pounds, but with mail it could weigh 1000 pounds); (3) Empty BMC (weighs 475 pounds); (4) Distribute mail to carrier routes (agency's goal is 1150 flats or 2270 letters per hour); (5) APCs and BMCs loaded with mail are pushed to various locations; (6) Breakdown APC and BMC containers of parcels weighing up to 70 pounds and place them into [*18] 48 carrier hampers; (7) Spread trays of letters and flats to the 48 letter cases; (8) Push rolling equipment to transport mail.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 To "breakdown" means to lift trays from the APC or BMC and place in area for someone else to sort mail.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

While complainant asserts that she can perform the essential functions of her distribution clerk position with or without a reasonable accommodation, the only evidence in support of her contention is her physician's general and vague opinion, without explanation, that complainant can perform manual activities such as letter sorting relatively well when seated. There is no other evidence in the record that addresses the other essential functions of complainant's positions such as pushing the APC or BMC equipment, breaking down and/or lifting trays of mail and placing them in other areas of the facility. Moreover, complainant fails to address the agency's safety concerns regarding complainant's request to use postal equipment to assist her in maneuvering throughout the agency and the agency's [*19] concerns regarding complainant's inability to meet its productivity standard. It is important note that S1 testified that he personally observed complainant's limitations which he found to pose a safety risk, in addition to preventing complainant from performing the essential functions of her position. Without contradictory evidence in the record, we must find that complainant was not "qualified" as to her distribution clerk position.

The discussion of "qualified" does not end at complainant's distribution clerk position. The term "qualified individual with a disability," with respect to employment, is defined as a disabled person who, with or without a reasonable accommodation, can perform the essential functions of the position held or desired. 29 C.F.R. § 1630.2(m). The term "position" is not limited to the position held by the employee, but also includes positions that the employee could have held as a result of reassignment. Therefore, in determining whether an employee is "qualified," an agency must look beyond the position which the employee presently encumbers. Accordingly, it must be considered whether complainant could have been reassigned to a different position. We [*20] note that because this case arose prior to June 20, 2002, the Commission will apply 29 C.F.R. § 1614.203(g), its prior regulation regarding reassignment. n3

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n3 **The agency is advised that 29 C.F.R. § 1614.203(g), which governed and limited the obligation of reassignment in the Federal sector, has been superseded and no longer applies.** 67 Fed. Reg. 35732 (5/21/02), to be codified as 29 C.F.R. § 1614.203(b). The ADA standards apply to all conduct on or after June 20, 2002, and emphasize, among other things, a broader search for vacancy. The ADA regulations regarding reassignment can be found at 29 C.F.R. § 1630.2(o) and 1630.9. Additional information can be found in the Appendix to the ADA regulations and in the EEOC's *Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act* (March 1, 1999) at Questions 25-30. These documents are available on the EEOC's website at www.eeoc.gov.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Complainant has an evidentiary burden in such reassignment [*21] cases to establish that it is more likely than not (preponderance of the evidence) that there were vacancies during the relevant time period into which complainant could have been reassigned. Clearly, complainant can establish this by producing evidence of particular vacancies. However, this is not the only way of meeting complainant's evidentiary burden. In the alternative, complainant need only show that: (1) he or she was qualified to perform a job or jobs which existed at the agency, and (2) that there were trends or patterns of turnover in the relevant jobs so as to make a vacancy likely during the time period.

Upon review of the record, we find that complainant failed to satisfy her burden. Complainant failed to argue that there were vacancies at the time of her request for which she was qualified with or without a reasonable accommodation. In fact, complainant does not even assert that reassignment should have been considered by the agency. Also, we find no

evidence in the record to support a finding that any such vacancies existed at the relevant time period.

Accordingly, the Commission finds that complainant failed to establish her claim that the agency failed to provide [*22] her with a reasonable accommodation.

Remaining Claims of Discrimination

Complainant also alleged that she was subjected to disparate treatment and unlawful harassment on the bases of race, sex and disability when: on February 23, 1999 to July 1999, she was only allowed to work 2 hours per night and forced to use leave to cover the remainder of her tour; on unspecified dates, S1 stayed at her work station and counted every piece of mail processed by her; on April 14, 1999, she was threatened with arrest by S1 in the presence of another employee and told not to come to work until this matter was resolved; and on May 12, 1999 and May 24, 1999, she was forced to go home by S2.

After a careful review of the record, we discern no basis to disturb the agency's finding of no discrimination as to these remaining issues. Complainant presented insufficient evidence of pretext or discriminatory animus.

CONCLUSION

Therefore, after a careful review of the record, including arguments and evidence not specifically discussed in this decision, the Commission AFFIRMS the agency's final decision finding no discrimination.

**CERTIFICATE OF MAILING**

**For timeliness purposes, the Commission [*23] will presume that this decision was received within five (5) calendar days after it was mailed. I certify that this decision was mailed to complainant, complainant's representative (if applicable), and the agency on:**

September 25, 2002

Date

Equal Opportunity Assistant

**LOAD-DATE:** October 16, 2002

Source: Legal > Area of Law - By Topic > Labor & Employment > Administrative Materials & Regulations > Federal > Agency Decisions > **Equal Employment Opportunity Commission Public Sector Decisions** ⓘ
Terms: 01a12209 (Edit Search)
View: Full
Date/Time: Tuesday, June 3, 2003 - 6:25 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.